693 S.E.2d 471

**Paul E. NESSELROAD, Petitioner Below, Appellee**

v.

**STATE of West Virginia CONSOLIDATED PUBLIC RETIREMENT BOARD, Respondent Below, Appellant.**

No. 34885.

Supreme Court of Appeals of West Virginia.

Submitted Feb. 9, 2010.

Decided April 15, 2010.

Jerri Jeaneen Legato, Charleston, WV, for Appellant.

David K. Hendrickson, Lora A. Arthur Dyer, Hendrickson & Long, Charleston, WV, for Appellee.

PER CURIAM:

The State of West Virginia Consolidated Public Retirement Board ("Board") appeals from the September 25, 2008, order of the Circuit Court of Kanawha County which reversed the Board's administrative decision denying Appellee Dr. Paul E. Nesselroad's request to reclassify a portion of his higher education service years. The Board argues that the trial court's decision to reclassify 6.592 of Dr. Nesselroad's years of service credit as "full salary years" for purposes of calculating his annuity benefits was erroneous. Upon our review of this matter in connection with the record and applicable statutes, we conclude that the reclassification of Appellee's service years was in error and, accordingly, we reverse the decision of the trial court.

## I. Factual and Procedural Background

Appellee, a former West Virginia University ("WVU") professor, is a member of the Teachers Retirement System ("TRS"). When Dr. Nesselroad retired on April 1, 1989, he had a cumulative service credit of 37.172 years. Of those aggregate years, Appellee accumulated 31.410 years while employed in higher education at WVU and 5.762 years while working in non-higher education. At issue below was Dr. Nesselroad's contention that 6.592 of the 31.410 higher education service years should have been added to the 5.762 non-higher education service years for purposes of annuity calculation. By reclassifying his years in this fashion, he sought to increase the number of service years for which his annuity would be computed based on his final "average salary" of $44,840. Dr. Nesselroad's annuity payments with regard to the 6.592 service years at issue were calculated based upon a statutory salary cap of $4800.

As support for the reclassification, Dr. Nesselroad relied upon the fact that prior to 1963 all TRS members had identical salary caps with respect to their salary-based contributions. Because the service years in question (1950–1960) occurred prior to the pre–1963 dichotomy of salary caps, Dr. Nesselroad argued that the higher education years at issue should be treated as "full salary years" in the same manner in which non-higher education service years are calculated for the pre–1963 period. *See* W.Va. Code § 18–7A–14a (2008). Rejecting Appellee's argument as flawed, the Board conclud-

ed that the parity of the pre–1963 salary caps for higher education and non-higher education members is inconsequential to the calculation of annuity payments because the manner in which service years are translated into benefits is controlled by statute. *See* W.Va.Code §§ 18–7A–14a; 18–7A–26 (2008).

The trial court reviewed the Board's denial of Appellee's reclassification request and made its ruling without the benefit of a hearing. In reversing the Board's decision, the trial court looked to the enactment of West Virginia Code § 18–7A–14a in 1971, pursuant to which teachers were given three options with regard to participation in a retirement plan.[1] Participants like Dr. Nesselroad, whose contributions to TRS were limited by a salary cap of $4,800 during the period of July 1, 1963, to July 1, 1970, were given the option under West Virginia Code § 18–7A–14a to make additional pension payments if they desired to participate in TRS based on their full salary.[2] In this manner, those participants who elected to make the "buy back" payments [3] within the specified one-year time frame had the opportunity to be placed on par with participants whose contributions had not been subject to a constant salary cap of $4,800 from 1963–1970.[4] Because Appellee's service years in question (1950–1960) predate the period subject to the "buy back" payments (1963–1970), the trial court determined that the Board wrongly relied on West Virginia Code § 18–7A–14a in denying Appellee's reclassification request. As additional support for its ruling, the trial court concluded that Dr. Nesselroad should not have been affected by the enactment of West Virginia Code § 18–7A–14a under the principle of statutory interpretation known as "grand-

fathering," as well as language from a prior decision of this Court.[5]

Through this appeal, the Board asks this Court to reverse the trial court's decision that Dr. Nesselroad is entitled to have the subject service years reclassified as "full salary years" for purposes of calculating his annuity payments.

## II. Standard of Review

As we recognized in *Martin v. Randolph County Board of Education,* 195 W.Va. 297, 465 S.E.2d 399 (1995), our review of the circuit court's ruling on a matter subject to the Administrative Procedures Act is governed by the same statutory standards of review employed by the trial court. *See id.* at 304, 465 S.E.2d at 406; W.Va.Code § 29A–5–4 (2007). Accordingly, we review the trial court's decision to reverse the Board to determine if the Board's decision was:

(1) In violation of constitutional or statutory provisions; or (2) In excess of the statutory authority or jurisdiction of the agency; or (3) Made upon unlawful procedures; or (4) Affected by other error of law; or (5) Clearly wrong in view of the reliable, probative and substantial evidence on the whole record; or (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

W.Va.Code § 29A–5–4(g). Combining these principles, we held in syllabus point one of *Muscatell v. Cline,* 196 W.Va. 588, 474 S.E.2d 518 (1996), that "[o]n appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in West Virginia Code § 29A–5–4(a) and reviews questions of law presented *de novo;* findings of fact by the administrative

1. *See infra* note 11.

2. Pursuant to the statute, higher education participants in TRS had twelve months from the effective date of the 1971 enactment of West Virginia Code § 18–7A–14a (March 6, 1971) to make the statutorily-required additional contributions.

3. As the trial court observed in its order, "Dr. Nesselroad has acknowledged he did not make the optional back payment for the specified time period."

4. The statute provides:

[A]ny such member who exercises such option and makes the required additional payment will then be considered entitled to retirement, death, withdrawal and all other benefits under the retirement system to the same extent *as if he had been paying into the retirement system the full amount provided by law for [non-higher education] members … throughout the period of his membership in the retirement system.* W.Va.Code § 18–7A–14a (emphasis supplied).

5. *See Nesselroad v. Ansel ("Nesselroad I"),* 188 W.Va. 193, 423 S.E.2d 596 (1992).

officer are accorded deference unless the reviewing court believes the findings to be clearly wrong."

With these standards in mind, we proceed to determine whether the trial court committed error in reversing the Board's denial of Appellee's request to reclassify a portion of his service years.

### III. Discussion

From its inception in 1941, the TRS has been comprised of two distinct groups of participants: higher education and non-higher education. Under its initial structure as a defined contribution plan, a retiring TRS member would receive a lump sum amount reflecting his or her total contributions; the employer's total contributions; and accrued interest. With the restructuring of TRS into a defined benefit plan that occurred in 1970, a retiring member receives a monthly annuity payment based on various actuarial assumptions, such as percentage of contributions; salary; and service years. *See generally* W.Va.Code § 18–7A–26 (setting forth factors which govern computation of annuity payments).

For more than twenty years, higher education and non-higher education members of TRS were subject to the same contribution limits.[6] Starting in 1963, non-higher education members were permitted to make contributions based on a maximum salary of $7500, while the contributions of higher education members continued to be limited by a maximum salary of $4800. When the salary maximum was later increased to allow non-higher education employees to contribute based on a maximum salary of $12,000 in 1967, higher education employees remained subject to the significantly lower salary cap of $4800.

The initial legislative response to the disparity between the contribution levels of higher and non-higher education members to TRS was the creation of a supplemental pension plan for higher education employees in 1963. *See* W.Va.Code § 18–23–4a (2008). With the enactment of West Virginia Code § 18–23–4a, higher education employees could make pension contributions based on the amount of their salaries that exceeded $4,800 to the supplemental plan known as TIAA/CREF. *See* W.Va.Code § 18–23–4a; *Nesselroad v. Ansel ("Nesselroad I")*, 188 W.Va. 193, 423 S.E.2d 596 (1992). Because of this opportunity to participate in the supplemental pension plan, higher education members were limited to making contributions to TRS based on the first $4,800 of their annual earnings. *See* W.Va.Code § 18–7A–14a.

In 1970 when the TRS became a defined benefit plan, the Legislature removed what was then a $12,000 salary cap on the contributions that non-higher education members could make to the plan, but the $4,800 salary cap for higher education members participating in the supplemental pension plan remained in effect.[7] Dissatisfied with the fact that non-higher education members were accumulating enhanced retirement benefits in comparison to them, the higher education community successfully lobbied the Legislature to participate in TRS without a salary cap. Responding to the demands of higher education members, the Legislature enacted West Virginia Code § 18–7A–14a in 1971. Through this enactment, education employees were given the option to elect between participation in one of three pension plans.[8]

One of the options available to higher education employees under West Virginia Code § 18–7A–14a was to become an "unlimited participant" in TRS. By exercising this option, a member could elect to make contributions based on his or her full salary rather than being restricted to a salary-capped basis of contribution. *See Nesselroad I*, 188 W.Va. at 195, 423 S.E.2d at 598. To become an "unlimited participant," a higher education

---

**6.** From 1941–49, contributions were limited to 4% of a maximum salary of $2500 salary; from 1949–53, contributions were limited to 5% of a maximum salary of $3060; and from 1953–63, contributions were limited to 6% of a maximum salary of $3067.

**7.** The salary cap on contributions to TRS for higher education employees who did not participate in the supplemental plan had been removed by the Legislature in 1969. *See Nesselroad I*, 188 W.Va. at 195, 423 S.E.2d at 598.

**8.** *See infra* note 11.

employee had to elect to participate solely in TRS as well as make a statutorily-specified "catch up" contribution between the period of March 6, 1971, to March 6, 1972, to account for the increased level of contributions that non-higher education members had been making from 1963 forward.[9] Individuals like Dr. Nesselroad who chose not to become an "unlimited participant" but to remain a split pension participant (being a member of both TRS and TIAA/CREF) could only contribute to TRS based on their first $4,800 of salary. Of significance, however, is the fact that those split participants retained the right to make pension contributions based on their salary in excess of $4,800 to TIAA/CREF.[10] *See Nesselroad I*, 188 W.Va. at 195, 423 S.E.2d at 598. Once a member made an election as to which pension plan option to participate in, the decision was intended to be inalterable. *See id.* at 196, 423 S.E.2d at 599.

In March 1988, the Legislature amended West Virginia Code § 18–23–4a to create a second opportunity for higher education members to make an election regarding their pension plan participation, which again included the option of electing to become an "unlimited participant"[11] in TRS. Three months later, this amendment was rescinded because the Legislature had overlooked the need to coterminously include a "buy back" provision to offset the lower contribution levels of members opting to become "unlimited participants" after years of participating in

TRS based on salary-affected contributions. *Cf.* W.Va.Code § 18–7A–14a. Appellee and several other higher education members sought to join TRS as "unlimited participants" before the statutory rescission took effect. Based on its anticipation of the statutory rescission, the Board denied the pension plan change requested by Dr. Nesselroad and other similarly situated teachers.

After the Board denied his application to become an "unlimited participant" under the amended language of West Virginia Code § 18–23–4a, Dr. Nesselroad, *inter alia,* sought a writ of mandamus from the Circuit Court of Kanawha County.[12] Because the petitioners in that action sought to alter their pension plan status before the statutory amendment was rescinded, the trial court granted a writ of mandamus on the issue of the petitioners' right to become "unlimited participants" in TRS. This right of participation, however, was determined to be prospective in operation only.[13] The trial court expressly rejected the petitioners' argument that there was an implied right to make additional pension payments and thereby be placed on par with those higher education members who had previously made "buy back" contributions between March 6, 1971, and March 6, 1972, as part of their election to become "unlimited participants." *See* W. Va. Code § 18–7A–14a. Reasoning that the provisions of West Virginia Code § 18–7A–14a for making the requisite back payments dur-

---

**9.** We discussed the "catch up" payments in *Nesselroad I:*

> [T]hose persons who were formerly limited in the amount they could pay into STRS [TRS] and who chose to become unlimited participants in STRS before 6 March 1972, could obtain full credit for all prior service on an "unlimited" basis by making back payments into the system to account for payments that would have been made had the electing employees been unlimited participants in the 1960's. Those electing to join on an unlimited basis who wished credit for pre–1971 service were allowed to buy pre–1971 credit by paying double the individual contribution they would have paid had they been unlimited members before 1971 to account for the missing employer contributions.

188 W.Va. at 196, 423 S.E.2d at 599.

**10.** As we recognized in *Nesselroad I*, not only did split participants contribute to TIAA/CREF, but the state also made contributions to the supple-

mental pension plan on behalf of the higher education members. *See* 188 W.Va. at 197, 423 S.E.2d at 600.

**11.** As was the case when West Virginia Code § 18–7A–14a was enacted in 1971, higher education members had three options with regard to selecting a pension plan: (1) participation solely in TRS; (2) participation solely in TIAA/CREF; or (3) participation in both TRS and TIAA/CREF. *See Nesselroad I*, 188 W.Va. at 195, 423 S.E.2d at 598.

**12.** *See Nesselroad v. Ansel,* Civ. Action No. 88–MISC–267, Circuit Court of Kanawha County, WV (June 30, 1988).

**13.** The Board notes that no appeal was taken from this ruling.

ing the temporally specified period "remain[ed] in full force and effect under the current retirement statutes," the trial court dismissed petitioners' belated attempt to "make back payments into STRS [TRS] for the years they failed to fully participate in such system."

Following the issuance of the mandamus ruling on June 30, 1988, Dr. Nesselroad opted to participate in TRS as an "unlimited participant" on a prospective basis. Less than one year later, Appellee retired. In 1990, Dr. Nesselroad and other higher education members filed a petition with the Circuit Court of Kanawha County, seeking to obtain a writ of mandamus to compel the Board to recalculate their retirement benefits. *Nesselroad I,* 188 W.Va. at 194, 423 S.E.2d at 597. In *Nesselroad I,* higher education members like Dr. Nesselroad, who became prospective "unlimited participants" as a result of the short-lived 1988 amendment to West Virginia Code § 18–23–4a, sought to have their annuity payments calculated without reference to the statutory proviso language governing the computation of benefits for those years when a member's contributions to TRS were subject to salary caps because they were also making contributions to TIAA/CREF. *See Nesselroad I,* 188 W.Va. at 196–97, 423 S.E.2d at 599–600; W.Va.Code § 18–7A–26(a) (2008). Characterizing the requested recalculation of benefits as an attempt to gain "credit for prior service for which they had made no contributions to the system," we affirmed the trial court's denial of the writ. *Nesselroad I,* 188 W.Va. at 194, 423 S.E.2d at 597.

The current proceeding, which Dr. Nesselroad instituted in 2005, is the third time Appellee has sought to obtain extraordinary relief in connection with the calculation of his retirement benefits. At issue here is whether his annuity should be recalculated based on 12.354 years at a "full salary" figure of $44,840 instead of 5.762 years at that figure as the Board has determined. Appellee contends that this recomputation is warranted because the service years he seeks to have

added (6.592) to the years calculated upon a "full salary" occurred during a time period when non-higher education and higher education members contributed to TRS based upon the same salary caps.

As we recognized in *Nesselroad I:*

Computation of annual retirement benefits from STRS [TRS] is governed by *Code,* 18–7A–26(a) [1981] which, in relevant part, defines a member's annual retirement benefit as the sum of:

Two percent of the member's average salary multiplied by his total service credit as a teacher. In this paragraph "average salary" shall mean the average of the highest annual salaries received by the member during any five years contained within his last fifteen years of total service credit: *Provided, that the highest annual salary used in this calculation for certain members employed by the West Virginia Board of Regents[14] at institutions of higher education under its control shall be four thousand eight hundred dollars, as provided by section fourteen-a [§ 18–7A–14a] of this article and chapter.*

188 W.Va. at 196, 423 S.E.2d at 599 (footnote added and emphasis in original). We explained that the statutory reference to "certain members employed by the West Virginia Board of Regents" was a reference to individuals like Dr. Nesselroad who were split participants before opting to become "unlimited participants" in TRS. *Id.* at 196, 423 S.E.2d at 599.

The calculation of retirement benefits for a member like Dr. Nesselroad who previously was a split participant in TRS necessarily requires a bifurcated computation, as we explained in *Nesselroad I:*

For the period before 1988, when appellants were split participants contributing to STRS [TRS] only on the basis of the first $4,800 of salary, appellees compute the retirement benefit for appellants, in accordance with *W.Va.Code,* 18–7A–26 [1981] as 2 percent of $4,800 multiplied by the total service credit compiled during appellants' status as split participants.

---

14. Due to the abolishment of the Board of Regents, the current version of West Virginia Code § 18–7A–26(c)(1) (2008) inserts employment by the West Virginia Higher Education Policy Commission in the stead of the Board of Regents.

For the period since appellants' 1988 election to be unlimited participants in STRS [TRS], appellees compute the retirement benefit as 2 percent of the appellants' average salary for the five highest years during the years since the election, multiplied by the appellants' total number of years compiled as full members. These two figures are then added to determine the total retirement benefit payable.

188 W.Va. at 196, 423 S.E.2d at 599.

The Board relied upon the same proviso language contained in West Virginia Code § 18–7A–26 that we found to be controlling in *Nesselroad I* to deny Dr. Nesselroad's request for reclassification in the case *sub judice*. *See* 188 W.Va. at 196, 423 S.E.2d at 599. In its recommended decision, the Board determined that the "difference in contribution rates between higher education and non-higher education, which occurred from 1963 forward," is not the triggering factor for the bifurcated annuity calculation. Instead, what controls the computation of a former split participant's benefits is the proviso language of West Virginia Code § 18–7A–26. Based on Dr. Nesselroad's decision to remain a split participant and to forego the opportunity to become an "unlimited participant" under West Virginia Code § 18–7A–14a, the Board concluded that the service years at issue were subject to the "express limitation on final average salary to $4,800.00" provided in West Virginia Code § 18–7A–26. We agree.

Through its enactment of West Virginia Code § 18–7A–14a, the Legislature created a *finite* opportunity for higher education members to "reach back" and make up for the years in which they had not participated in TRS on a full salary basis. By taking advantage of the statutorily-specified "buy back" payment provisions, a higher education member was placed on "even footing" with the non-higher education members in terms of retirement benefits. That the Legislature intended the "buy back" payments to have a retroactive effect is clear:

[A]ny such member who … makes the required additional payment will then be considered entitled to retirement, death, withdrawal and all other benefits under the retirement system to the same extent *as if he had been paying into the retirement system the full amount provided by law for [non-higher education] members … throughout the period of his membership in the retirement system.*

W.Va.Code § 18–7A–14a (emphasis supplied).

If Appellee had elected to become an "unlimited participant" by timely complying with the "buy back" provision of West Virginia Code § 18–7A–14a, the fact that he had once made salary-capped contributions would not have had a correspondent reductive effect on his TRS retirement benefits. This is because the statute specified that such an individual became "entitled to retirement … benefits … as if he had been paying into the retirement system the full amount provided by law for [non-higher education] members … throughout the period of his membership in the retirement system." W.Va.Code § 18–7A–14a. Critically, however, Dr. Nesselroad chose not to accept the one-time offer extended by the Legislature to be treated as though he had been contributing as an "unlimited participant" from the beginning of his membership in TRS. *See id.*

■ Appellee's decision not to become an "unlimited participant" pursuant to the provisions of West Virginia Code § 18–7A–14a is what prevents him from having the questioned service years calculated as full service years—not the fact of his salary-capped contributions.[15] *See* W.Va.Code § 18–7A–26. Once the time period passed for making the "buy back" payment and gaining full participant status—a status that had a retroactive reach to the start of an individual's membership in TRS—the non-electing higher education member effectively waived the opportunity to transform his pre–1971 contribution years from salary-capped years into full participation years. *See* W.Va.Code § 18–7A–

---

**15.** This is demonstrated by recognizing that those higher education members who opted to make the "buy back" payment specified in West Virginia Code § 18–7A–14a were not affected by the proviso language limiting the pension multiplier to $4,800 even though their contributions were salary-capped before they elected to become "unlimited participants."

14a. Having thus waived the opportunity to have those pre–1971 contribution years treated as full participation years, there is no basis for Appellee's attempt, almost forty years later, to gain statutory benefits that clearly expired on March 6, 1972. *See* W.Va. Code § 18–7A–14a.

The trial court concluded that the provisions of West Virginia Code § 18–7A–14a were inapplicable because the service years at issue (1950–1960) pre-date the period of time covered by the "buy back" (1963–1970). As discussed above, West Virginia Code § 18–7A–14a has a retroactive reach to the beginning of an individual's membership in TRS for those higher education members who elected to participate in the "buy back." And the benefits attached to that retroactive reach (calculation of annuity based on full salary) vanished with the expiration of the statutory "buy back" period. *See* W.Va.Code § 18–7A–14a. Consequently, the trial court erred in its determination that the service years at issue could be calculated for annuity purposes as full salary years rather than being subject to the $4,800 multiplier imposed by the proviso language contained in West Virginia Code § 18–7A–26.

As additional support for its ruling that Dr. Nesselroad was entitled to have the service years at issue calculated based upon his full salary rather than the $4,800 multiplier, the trial court seized upon a singular sentence of mere *dicta* from *Nesselroad I*. In relating how the contributions of higher education and non-higher education members to TRS were structured before 1963, we stated: "Their contributions to the system, *and their future benefits,* however were limited to their full salary or a statutorily established maximum, *whichever was higher*." *Nesselroad I,* 188 W.Va. at 195, 423 S.E.2d at 598 (emphasis supplied). Taking the emphasized language out of context, the trial court reasoned that Dr. Nesselroad's full salary for annuity purposes ($48,400) was higher than the $4,800 statutory maximum and thus opted to employ the higher figure for purposes of annuity calculation. In reaching this conclusion, the trial court overlooked two critical issues of historical consequence. First, because TRS was a defined contribution plan

during this time period, future benefits *were* directly related to contributions during the specified pre–1963 time period. And, second, as the Board related, the statutory maximum was often higher than the salaries of the contributing members during this time period. *See supra* note 6 (delineating maximum salary contributions from 1941–1963). Upon examination, the language from *Nesselroad I* relied upon by the trial court to support its use of a full salary rather than a $4,800 multiplier for calculating the annuity payment relative to the subject service years is simply inapposite. *See* 188 W.Va. at 195, 423 S.E.2d at 598.

As a final basis for its decision, the trial court looked to our decision in *Crock v. Harrison County Board of Education,* 211 W.Va. 40, 560 S.E.2d 515 (2002), to conclude that no changes could take effect with regard to Dr. Nesselroad's pension once he was a member of TRS. The basis upon which we applied the principle of "grandfathering" in *Crock* was express statutory language providing that no reduction in benefits could take place with regard to benefits in existence on a specified date. *Id.* at 45, 560 S.E.2d at 520. In contrast to *Crock,* there is no correspondent statutory clause in effect here that proscribes any reduction in benefits that had already been extended. Of even more import, however, is the fact that the Board did not take any benefits away from Dr. Nesselroad. Appellee voluntarily gave up the opportunity to avail himself of the benefits offered by the Legislature through the enactment of West Virginia Code § 18–7A–14a. As a result, neither this Court's decision in *Crock* nor the principle of "grandfathering" have any bearing on the matter before us.

Based on the foregoing, we determine that the Board correctly concluded that Dr. Nesselroad was not entitled to a reclassification of the service years at issue. Those years were properly determined to be subject to the $4,800 multiplier under the statutory proviso set forth in West Virginia Code § 18–7A–26. Because we determine that the trial court lacked any of the requisite statutory grounds for reversing the administrative ruling of the Board, the decision of the Circuit

Court of Kanawha County is reversed. *See* W.Va.Code § 29A–5–4.

Reversed.